KELLY *v.* DAVIDSON ET AL.

[No. 18,903. Filed December 29, 1958. Rehearing denied January 22, 1959. Transfer denied March 17, 1959.]

*Armstrong, Gause, Hudson & Kightlinger* and *Erle A. Kightlinger,* of Indianapolis, for appellant.

*Bagot, Free & Shearer,* of Anderson, for appellee, Jack Kelly.

*Jerrald O. Finney,* of Anderson, *Symmes, Sparrenberger & Duvall, William Sparrenberger,* of counsel, of Indianapolis, for appellee, Jack Davidson.

COOPER, J.—This is an action by the appellee, Jack Davidson, against appellant, Opha Kelly, and his son, appellee, Jack Kelly, to recover damages on account of personal injuries alleged to have been caused when the appellee Davidson, in the company of appellee Kelly and one Roy Browning, went to the premises of the appellant, Opha Kelly, and assisted in the cutting down of a box elder tree, said tree falling upon the person of appellee Jack Davidson, injuring him.

The record reveals the issues were made by each of the parties following the proper pleadings, the cause was submitted to a jury, which returned a verdict for the appellee Jack Davidson, and against the appellant, Opha Kelly, upon which the court entered judgment. The jury also found for Jack Kelly, originally a party defendant.

The appellant filed its motion for a new trial which was overruled, the overruling of the motion for a new trial is assigned in this court as error.

. The appellee Davidson's complaint is in two para-

graphs. The pertinent negligence averred is as follows: "That defendant Opha Kelly had carelessly and negligently allowed said tree to become dangerous in that the defendant Opha Kelly, had partially cut down said tree, and that the remaining portion was so weakened, thereby as to cause said tree to fall without further effort at removal and without warning; that defendants Opha Kelly and Jack Kelly had knowledge of the dangerous condition of said tree; that while plaintiff was on said premises as the invited guest of defendants Opha Kelly and Jack Kelly, said tree fell on plaintiff, injuring plaintiff as hereinafter more particularly set forth; that defendant, Opha Kelly, had allowed said tree to become dangerous in that defendant, Opha Kelly, had partially cut down said tree, and that the remaining portion was so weakened thereby as to cause said tree to fall without further effort at removal, and without warning; that defendant Jack Kelly carelessly and negligently failed to give plaintiff any warning as to the falling of said tree prior to its falling; that as the sole and proximate result of defendant's negligence, as hereinabove set forth, said tree fell on plaintiff, injuring plaintiff as hereinafter more particularly set forth."

A review of the evidence in the matter before us affirmatively shows that there is no conflict in said evidence. A condensed version of the facts as elicited by the evidence shows that the appellant, accompanied by his wife, left his home in Anderson, Indiana, for Big Chapman Lake on January 1, 1954; that during the summer before, he had topped the box elder tree growing in his yard at different periods during the entire summer. The evidence showed that said tree was approximately eleven (11") inches in diameter and approximately ten (10') feet in height to a fork

in said tree and the branches comprising of the fork were five or six inches in diameter. Before the appellant left for the lake, he told his son, Jack Kelly, that if he didn't have anything to do he could go out in the yard and chop down the tree.

The evidence further shows that appellee Jack Kelly procured a small hand hatchet from the basement of his father's home, climbed up into the tree, cutting the little limbs out of his way; thereafter, he went next door and borrowed a little saw and cut the two small limbs so all that was left was the main trunk, which was ten (10') feet in height and two little stubs where the main branches had been cut.

The evidence further reveals that he started cutting the main trunk with the said hatchet but made no progress, so that he went to the home of the appellee, Jack Davidson, and borrowed an axe, and, while there, said that Jack Davidson should come down and help him cut the tree.

The evidence further revealed that after the said Jack Kelly had returned home and had been chopping the tree for approximately fifteen minutes with the borrowed axe, Jack Davidson arrived and later helped chop on the tree. Thereafter, Roy Browning appeared on the scene, and, upon the suggestion of Jack Kelly that he was a "strong guy," Browning also helped chop on the tree. All three took turns chopping on the tree for approximately half-an-hour, and, thereafter Jack Kelly procured a rope which was tied to the top of the tree and the three, Jack Davidson, Jack Kelly and Roy Browning, pulled on the rope so attached to the tree; that the tree fell upon the third pull, and, in falling, the tree struck Jack Davidson and knocked him to the ground, causing the injuries complained of.

The evidence in the record concerning the condition of the box elder tree prior to the accident seems speculatory. Said evidence consisted mainly of the opinion of one Sterling Garrett, a tree surgeon, as witness for the plaintiff, who admittedly never saw the tree:

"Q. In the course of your activity, as tree surgeon, and in the operation of this business, have you become familiar with the characteristics of box elder trees?

"A. Yes sir, several times.

"Q. And have you felled box elder trees?

"A. Yes sir.

"Q. I ask you, is a box elder tree, a hard wood tree?

"A. It is not, sir.

"Q. Next, Mr. Garrett, will you tell the jury, based upon your experiences, what the effect would be on a box elder tree, to have in the summer of 1953, remove all the limbs and foliage from that tree so that only the trunk and stubs of limbs remained, what the effect of that would be on a box elder tree, by January 2, 1954, some six months later, a couple of seasons later?

"A. I would say, sir, that in 1953, it was dry in the summer time and during that time it was dry and hot and if you trim a box elder tree in the summer, trim it close like you explained, without—cutting your limbs real short and putting some type of sealer to it, it would kill it.

"Q. Now, what effect would that killing, which you speak of have with regard to making the box elder tree brittle or unbrittle, what effect would it have on its characteristics?

"A. Well, a box elder tree is naturally brittle in the center, anyway, and since it all died, it becomes more brittle in the center.

"Q. Now, in your experience with box elder trees, is there a splintering sound before they fall, or not?

. . . . .

"A. Well, since a box elder is brittle in the center and it have been—died, it becomes more brittle and very seldom they ever crack or split when you cut them that way, if you don't know the tree and they're hard on the outside, and if you don't know the tree and know it's dead on the inside, it would fall without warning.

. . . . .

"Q. Mr. Witness, have you seen the box elder tree that, which we are discussing in this case?

"A. No sir, I have not.

"Q. Have you seen the stump of the tree?

"A. No sir, I have not.

. . . . .

"Q. Assume Mr. Witness, a box—the trunk of the box elder tree, approximately ten feet high, which had been topped, approximately eleven (11) inches in diameter, with a slash or notch, approximately eighteen (18) inches from the ground, and that notch being the depth of ¼ of a tree, is that tree in any danger of falling, without warning?

"A. You'd have to give me just a little more information, how far around the sides was it cut?

"Q. On one side.

"A. It was cut around one side?

"Q. No, just the slice was on one side, Mr. Witness, and was of a depth of approximately ¼ of the tree.

. . . . .

"Q. Now do you have the question in your mind, Mr. Witness?

"A. I believe I understand you, if a—it is true that it could fall without warning if your notch was cut right, yes.

"Q. Sir?

"A. It is true that it could fall without warning if the notch had been cut right.

"Q. Even though three-fourths of the tree had not yet been cut?

"A. Yes sir, because it was brittle on the inside, it is brittle on the inside and if you cut around the tree, to a certain extent it could fall.

"Q. But the slice wasn't around the tree, Mr. Witness, the evidence is, that the slice was on one side.

. . . . .

"Q. Now so that I can get my mind—a—in my mind exactly what you are testifying to, I will repeat my former question, assume a box elder's trunk of a tree, approximately ten feet high, which had been topped, and which was approximately eleven inches in diameter, with a slash in it the depth of one-fourth of the tree, itself, that slice being on one side only, and that slash being approximately eighteen inches from the ground, is that tree in any danger of falling?

"A. By itself, no.

. . . . .

"Q. Assume Mr. Witness, that the tree about which you—had not been topped, in the summer of 1953, then in January of 54, the tree still having all its limbs would it be a live or dead tree?

"A. It would be just according sir, whether it had a disease, or not, to kill it in that time.

"Q. Assume that it had no disease, Mr. Witness, would it be a live tree or dead tree?

"A. Well it would depend on whether it was alive or dead in the summer.

"Q. Assume Mr. Witness, that it was alive in the summer of 1953.

"A. I would probably say that it would still be alive if it didn't have a disease of any type to kill it.

"Q. If it had no disease, and it was still a live tree, would it be more or less brittle, as you have testified?

"A. All box elders are brittle on the inside but

it wouldn't be as much brittle, as if it was still alive.

"Q. That's all. If it were alive, that's all."

This was all of the evidence on the subject of the condition of the box elder in question prior to sawing, chopping and pulling on said box elder tree by the two appellees herein and Roy Browning. Said evidence of the tree surgeon, Sterling Garrett, in no way tends to support the acts of negligence alleged in said paragraphs one and two of the appellee's complaint.

Our court has many times held that it is well settled that a decision or finding must be based upon the proven facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation. *Smith, Executrix* v. *Strock, Executor* (1945), 115 Ind. App. 518, 60 N. E. 2d 157, and cases cited. Now, in this case it appears from the evidence that the cause of the fall of the tree was the pulling over of the same by a rope fastened thereto, and the rope attached to the tree was pulled by the said Jack Davidson, Jack Kelly and Roy Browning. This lacks much in supporting the allegations of the complaint that the tree was "dangerous in that defendant Opha Kelly, had partially cut down said tree, and that the remaining portion was so weakened, thereby as to cause said tree to fall . . ." Certainly, such evidence fails to support the alleged fact that the tree fell upon the appellee, "without further effort at removal and without warning."

Evidence sufficient to sustain a judgment must be substantial evidence with probative value. *Pennsylvania R. Co.* v. *Rizzo* (1949) (T. D. 1949), 119 Ind. App. 505, 86 N. E. 2d 91, and cases cited therein.

Judge Royse, speaking for this court in *Von-ville* v. *Dexter* (1948) (T. D. 1948), 118 Ind. App. 187, 208, 76 N. E. 2d 856, said:

"By probative value we mean evidence 'carrying quality of proof and having fitness to induce conviction.' "

See, also *Darby et al.* v. *Schoolcraft et al.* (1955), 125 Ind. App. 440, 125 N. E. 2d 812.

The evidence reveals that the appellee Jack Davidson came to the house of the appellant to voluntarily assist the appellee Jack Kelly. Prosser, in his work on the Law of Torts, at p. 457, stated:

"Anyone invited to do business or work on private premises not open to the public normally has the assurance that the place is prepared for him, *but one who comes to volunteer assistance, although he confers benefit, is treated as a licensee. . . .*" (Our emphasis.)

On page 449, in discussing licensees, Prosser further states:

"The licensee has no right to demand that the occupier change his method of conducting activities for his safety, and in the usual case, if he is fully informed as to what is going on or it is obvious to him, he has all that he is entitled to expect, and assumes the risk thereafter."

Upon the record before us, it appears that the alleged negligence on the part of the appellant as charged in appellee's complaint, was not the proximate cause of the injury suffered by the appellee. It appears from the evidence in the record before us that the injury of the appellee, Jack Davidson, was the direct and proximate result of the active, independent actions of the said Jack Kelly, Jack Davidson, and Roy Brown-

ing in attempting to and finally pulling over said tree with a rope and not the prior condition of the box elder tree as alleged in appellees' complaint.

Our court has said in the case of *Wilcox* v. *Urschel* (1936), 101 Ind. App. 627, 631, 200 N. E. 465:

"Where an injury is to some extent due to two distinct successive causes, unrelated in operation, and one of them is a prior, passive or remote cause, which does no more than furnish a condition or give rise to the occasion by which the injury was made possible, and the other cause is an active, direct, independent, effective and intervening cause, the law is well settled, that courts will, as a general rule, with but few exceptions, look only to the latter as the proximate cause and will disregard the former or remote cause. It has been many times recognized by the courts of this state that an intervening responsible agent may cut off the line of causation from the original negligence. See: *Pennsylvania R. Co.* v. *Huss* (1933), 96 Ind. App. 71, 180 N. E. 919; *Sarber* v. *City of Indianapolis* (1920), 72 Ind. App. 594, 126 N. E. 330; *McGahan* v. *Indianapolis Gas Co.* (1895), 140 Ind. 335, 37 N. E. 601."

Also, in the case of *Indiana Service Corporation* v. *Johnston* (1941), 109 Ind. App. 204, 206, 34 N. E. 2d 157, this court stated:

"An essential element of proximate cause is the requirement that the result must be such as might reasonably have been anticipated in the ordinary experience of men. In applying this rule to a case like the instant one, wherein the alleged negligence merely created a condition by which the injury was made possible and the subsequent independent act of an intervening agency caused the injury, logic requires not only that the type of injury should have been reasonably anticipated, but that the intervention of the independent agency should have been anticipated.

"The rule has been so applied frequently in this state. See *Wilcox* v. *Urschel* (1936), 101 Ind. App.

627, 200 N. E. 465; *City of Gary* v. *Struble, Admx.* (1939), 106 Ind. App. 518, 18 N. E. 2d 465; *Engle, Admr.* v. *Director General of Railroads* (1922), 78 Ind. App. 547, 133 N. E. 138; *Evansville, etc., R. Co.* v. *Welch* (1900), 25 Ind. App. 308, 58 N. E. 88; *Farber* v. *City of Indianapolis* (1919), 72 Ind. App. 594, 127 N. E. 330; *Claypool* v. *Wigmore* (1904), 34 Ind. App. 35, 71 N. E. 509; *Alexander* v. *Town of New Castle* (1888), 115 Ind. 51, 17 N. E. 200; *Blanchard* v. *Reynolds* (1921), 236 Mass. 596, 129 N. E. 303; *Cleveland, etc., R. Co.* v. *Clark* (1912), 51 Ind. App. 392, 97 N. E. 822; *Pennsylvania Railroad Co.* v. *Huss* (1933), 96 Ind. App. 71, 180 N. E. 919."

From an examination of the record, it appears to this court that there is no evidence of probative value which supports the charge of negligence made in the complaint, and that the undisputed evidence shows that the alleged negligence of the appellant was not the proximate cause of the injuries complained of, and that reasonable minds could not differ regarding such conclusion. Therefore, the verdict of the jury is contrary to law. The trial court should have sustained the appellant's motion for a new trial. It is not necessary for us to consider the other questions presented by this appeal.

Judgment reversed.

NOTE.—Reported in 154 N. E. 2d 888.