FRANCIS SALAZAR *v.* STEVEN SENIOR.

[No. 971A178. Filed February 10, 1972.]

*Parr, Richey, Obremskey, Pedersen & Morton,* of Lebanon, for appellant.

*Eugene B. Burns,* of Lebanon, for appellee.

LOWDERMILK, J.—Plaintiff-appellant filed her petition in the Boone Circuit Court, Juvenile Division, praying that defendant-appellee be determined to be the father of her minor child, which was born out of wedlock on March 16, 1970, together with prenatal care, doctor and hospital expenses, reasonable attorney fees, costs, and for support of the child.

Appellee filed answer in general denial.

The cause was tried by the court, which entered findings and judgment against the plaintiff-appellant.

Plaintiff-appellant's motion to correct errors assigned two reasons, namely, the decision of the court is contrary to law and that the decision of the court was not supported by sufficient evidence as to claimed defenses.

This was followed in the motion to correct errors itself by a resume of some of the evidence. A portion of the motion to correct errors reads as follows:

"The Plaintiff respectfully submits to this Court that the testimony of the Defendant has been impeached to such an extent that his testimony could not be relied upon in arriving at a finding. This case is much stronger than the *Carpenter case, supra,* as we have brought to the Court witnesses who testified to seeing the Defendant at the Sky Vue Drive-in Theater on the night of June 16, 1969, in the presence of the Plaintiff and witnesses to show that the Defendant and Plaintiff have been together on several other occasions. None of these occasions were within the dates of July 15th and July 20th of 1969. The witnesses called to the stand in behalf of the Plaintiff, were, in the opinion of the writer, completely unbiased as they had no interest, either financially or otherwise, in the outcome of the litigation."

In plaintiff-appellant's statement of the issues for review she sets out the second cause for which the court should correct errors as follows:

"* * * (a) that the decision of the Trial Court is not supported by sufficient evidence as to claimed defenses by the Appellee."

Inasmuch as the court found for the defendant-appellee and this is a negative judgment, specification 2 of the motion to correct errors presents no question to this court.

*Mitchell* v. *Lawson* (1969), 145 Ind. App. 141, 250 N. E. 2d 259, speaking of negative judgments, said:

"The first part of Specification No. 1, to the effect that the verdict was not sustained by sufficient evidence, presents no question for our consideration since this is an appeal from a negative verdict." [Citing *Hinds* v. *McNair* (1955), 235 Ind. 34, 129 N. E. 2d 553.]

We shall now direct our attention to the first specification of error, that the decision of the trial court was contrary to law.

The parties to this action became acquainted when they were sophomores in high school. The defendant-appellee at the time of the trial testified he was 20 years of age and admitted that he knew plaintiff in high school in the sophomore or junior years, when he was about 18 years of age. He further testified he had not taken her out after meeting her in high school and was never alone with her.

He admits he was out with plaintiff-appellant after July 15th and before July 20th of 1969. On these occasions his car was broken down and she came out and picked him up in her car. They were together three times between July 15th and July 20th, with each of these times being during the night.

He admits he had sexual relations in the country near Lebanon and that the first time as he reached his climax "I pulled it out and had my climax in my handkerchief."

On the second occasion she called him and asked him to go out, and picked him up at his father's home. They rode out to the same place, which was between July 15 and 20, 1969. He did not know whether it was Tuesday or Wednesday or what day it was.

They again had sexual relations; this time he wore a contraceptive or a rubber.

On the third time they were out riding they went to about the same place and followed the same routine, which was between July 15th and 20th and at which time he used a contraceptive or rubber.

He further testified that he did not at any time subsequent to July 20, 1969, go out with the plaintiff-appellant and neither did he call her.

He further testified he did not have any knowledge as to whether she was keeping company with any other men during May or June, 1969. He did testify that she went to some beer parties with other men where her conversation about them would indicate that it was a place where there were mixed couples and they swapped spouses or dates for the evening. He further testified she said that she would go to bed with a partner and that this partner was a man. She used the expression that she "got married over the week end" which he interpreted to mean that she had stayed all week end with a "guy."

He further testified she told him they were having big beer parties someplace in Speedway at the Tara Apartments between the 15th and 20th of July, 1969, and picked him up and took him there but they could not find the party and they then went to the graveyard south of Lebanon and had his first admitted act of sexual intercourse with her.

Defendant-appellee further testified that he had never been with her at a drive-in at any time and had never taken her to any movies. He never discussed the baby with her before or after it was born and first learned of her pregnancy in March of 1970.

Plaintiff-appellant testified that she was a beauty operator and lived with her aunt, who was her guardian and had lived in Lebanon for eleven years.

She testified that she first became acquainted with defendant-appellee at a girl friend's house and was introduced to him by the girl friend. This was when she was a sophomore in high school and on a Tuesday night. Defendant-appellee did not attend the same high school that she did. However, she claims she dated him while they were in high school and they

had sexual intercourse on numerous occasions. They were together on several occasions after graduation.

She testified that she was with defendant-appellee in June of 1969 and on other occasions and they would "just go out." He never took her to any parties or around people. However, she testified that in June, 1969, she went to the drive-in with Steve Senior on a pre-arranged date. He was driving her aunt's automobile and it was on a Sunday in June. She does not remember the exact date. She picked him up that day at his trailer by a pre-arranged telephone call. The car she was driving was a burgundy Catalina Pontiac.

The name of the movie was "Dr. Doolittle." Steve got popcorn and came back to the car and sat until the movie started and they watched the show for a short time and then had sexual intercourse without using preventative measures or contraceptives. She further testified the only time that preventative measures were used when they had sexual relations was on the first date when they were in high school.

Plaintiff-appellant did not know at what time during her menstrual cycle the sexual intercourse took place, but that she had had a period before that time and that was the first time she had had intercourse with Steve Senior since her last period. She testified she had not had intercourse with anyone else except a long time ago when she was a freshman in high school and that she did not have intercourse with anyone else during the month of June, 1969, besides Steve Senior.

She admitted going out with one Mike Cole during the month of June.

After the occasion at the drive-in in 1969 she admitted that every time she was with Steve Senior thereafter they had sexual intercourse but she does not remember exactly the number of times—thinks it was three or four. She did not have a menstrual period after the claimed June intercourse with Steve Senior.

At the drive-in she recognized certain people and called them as witnesses.

Christine Conarroe testified she was acquainted with the plaintiff-appellant for about three years and admits seeing Steve Senior in the early part of June, 1969, when he was in the company of plaintiff-appellant. On one occasion, in June, 1969, plaintiff-appellant was with Christine and saw defendant-appellee at a Burger Chef and she got out and got in the car with him, which was a green Mustang.

She did not recall plaintiff-appellant having gone out with any other man than Steve Senior during May or June, 1969.

William Eugene Miller testified that in the year 1969 he and his wife were at the Sky Vue Drive-in and saw Marcia Yarber. He saw Steve Senior going into the restroom and plaintiff-appellant going into the concession stand and they came back together and returned to their car. He testified the car was a burgundy automobile but did not know the make. He was not personally acquainted with plaintiff-appellant but thought he could point her out in the courtroom.

Marcia Yarber had known plaintiff-appellant since the 10th grade. She saw her and Steve Senior at the Sky Vue Drive-in in June, 1969. The show playing was "Dr. Doolittle." She said they were in a dark red car, but did not talk to them or see anyone else around their car. She never witnessed any sexual relations that evening.

Jeaneva Jill Miller has known plaintiff-appellant seven or eight years and was acquainted with Steve Senior. She saw them together at the drive-in the summer of 1969 when the show of "Dr. Doolittle" was playing. They were parked in a red or burgundy colored car one row behind her and her husband. She saw no one else enter or leave the car and did not witness them having sexual intercourse.

Brenda Lee Reagan has known the plaintiff-appellant for ten years and Steve Senior for about four years. She testified she saw the parties together the last Sunday of July, 1969,

riding around in Steve's car, a green Mustang, and saw them on one other occasion driving through the park in a green Mustang. She further testified she had never seen them having sexual relations.

Carol Shepherd testified she was a friend of plaintiff-appellant for a number of years and that a man named Ed Daniels wanted to marry plaintiff-appellant but her guardian aunt would not permit it. She returned the ring to him on Christmas Eve of 1967 and she further testified that plaintiff-appellant told her she had been going to Frankfort where she had met some boys. She also testified "I observed Francis in the presence of boys at high school and she always had fun with them and actually went out of her way to have fun with them and be nice to them." Ed Daniels was the only person known to that witness who had been engaged to Francis.

On cross examination she testified her conversation with Francis regarding her going to Frankfort was sometime in 1969.

Ruth DeLaRosa, a witness, testified that she went steady with Steve Senior and dated him for a period of time during their junior and senior years in high school and afterward. They stopped dating regularly but still had some dates. After graduation she left the state, then came back and still dated him. They attended movies at the Sky Vue Drive-in and *"At that time I owned a candy apple red 1968 Mustang. I had that car in 1969 and on some of our dates we would be in my car at the drive-in."* On cross examination she testified "It was possible I had dates with Steve Senior in June of 1969. It was in the summer, it could have been the latter part of May or the first part of June."

The parties stipulated during the trial of the cause the following:

"The parties entered into a stipulation that Doctor Doolittle was playing at the Sky Vue Drive-in Theater in Lebanon, Indiana, on the dates of June 15th, 16th and 17th of 1969."

In appellant's brief she contends that if the appeal court considers all the evidence favorable to the appellee there will be no conflict in the evidence for the reason that the evidence to be considered by the review court must have the fitness to induce conviction and support a conclusion in the minds of reasonable men and it is the contention of the appellant that the appellee did not present such evidence in this case.

Appellant's brief further recites:

"It is well recognized that a decision of the trial court will not be disturbed if there is evidence of probative value to support such decision, but on the other side of the coin, it is also recognized that in the absence of such evidence the decision must be based upon proven facts and cannot be based merely upon guess, conjecture, surmise, possibility or speculation."

In the argument portion of her brief plaintiff-appellant cites the case of *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669, stating that it and many other cases hold:

"To determine this question we will consider only the evidence most favorable to the appellee, together with any reasonable inferences which may be drawn therefrom."

She further argues that in considering the evidence most favorable to the appellee the review court will consider evidence which has probative value. She sets out that probative value was defined by this court in the case of *Hunnicutt* v. *Boughner* (1968), 141 Ind. App. 669, 231 N. E. 2d 159 as follows:

"By probative value we mean evidence 'carrying quality of proof and having fitness to induce conviction.'"

She further cites from the *Hunnicutt* case the case of *Kelly* v. *Davidson, et al.* (1958), 129 Ind. App. 384, 392, 154 N. E. 2d 888:

"Our court has many times held that it is well settled that a decision or finding must be based upon the proven facts and

cannot be based upon mere guess, conjecture, surmise, possibility or speculation.

"Evidence sufficient to sustain a judgment must be substantial evidence with probative value."

She cites *Burke* v. *Burke* (1963), 135 Ind. App. 235, 191 N. E. 2d 530, wherein this court by Judge Hunter, now of the Supreme Court, stated that whether there was substantial evidence or reasonable inferences which could be drawn therefrom to support the essential allegations of a complaint, held in part:

"Substantial evidence has been defined to mean 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

The *Burke* case was one involving a guest statute which, of course, was a case where the court had found against the defendant rather than against the plaintiff, as in the case at bar. She further argues that the *Burke* case is authority for the proposition that the evidence to be considered as being favorable to the appellee must be evidence of probative value and be such as to induce conviction. With this we cannot agree in the case at bar as the plaintiff-appellant must prove her case by a preponderance of the evidence. Her failing to do so necessarily is a failure to make a case and does not entitle her to a judgment.

Plaintiff-appellant's further contention that the testimony of the appellee in the case at bar was impeached by testimony of independent witnesses and should not be considered by this court in arriving at a ruling is absolutely untenable and is not the law of the State of Indiana. It is true that some of plaintiff-appellant's witnesses testified that the appellee was in the presence of the plaintiff-appellant in the middle of June at the "Dr. Doolittle" movie at the drive-in. There is a conflict in that evidence as to the make of the car and the color of the car. There is no evidence that these two people had sexual relations at the drive-in except

that of the plaintiff-appellant when, in truth, and in fact, one witness was sitting in a car immediately in front of the parties to this litigation and had access to and could have seen, had she been looking, the parties enjoying the partaking of sexual relations in the automobile to the complete neglect of observing the actions of Dr. Doolittle on the screen. No one testified they saw these parties having sexual relations that evening.

The evidence on this point and on that day boils down to the fact it is the word of one of the parties against the word of the other.

Throughout the brief of plaintiff-appellant she testified that she had her menstrual periods regularly but could not say when. This certainly goes to her credibility as a witness.

Plaintiff-appellant contends that the testimony of the appellee that they had never been together except on three occasions, *does not provide a conflict in the testimony for the reason that the appellee's testimony is not of probative value.* This contention is not the law in Indiana. It is the law in Indiana that the court is to determine what evidence has probative value. Plaintiff-appellant testified they had been together on many occasions. Defendant-appellee testified that they had been together only on three occasions and therefore there is a conflict in the evidence irrespective of the testimony of any other witnesses. The evidence of the appellee did have probative value and was entitled to the weight and credence that the trial court decided it should have, considering the evidence of the other witnesses, their interest in the litigation and its outcome, whether or not witnesses were relatives or close friends of either or both of the parties, their demeanor and attitude upon the witness stand, as well as he could consider the demeanor of each of the parties on the witness stand and consider his or her interest in the case, his or her bias and prejudice, if any, the same as he could any other witness called upon to testify.

The evidence that the appellee attempted to pay appellant after the filing of the petition herein if she would not take the matter to court goes to his credibility and may be considered by the court along with all the other evidence and is not an admission that he was the father of the child, which, by the way, was a fully developed 8 pound 2 ounce infant girl. The court had the right to consider that any such offer was made to avoid embarrassment and to dispose of a charge against him for a money consideration without going to court.

This court said in *Nat. Life, etc., Ins. Co.* v. *Williams* (1926), 84 Ind. App. 343, 138 N. E. 826:

". . . It is a well-settled rule that, 'an offer, concession or admission, made in the course of an ineffectual treaty of compromise, and constituting, in itself, the point yielded for the sake of peace, *and not because it was just or true,* is not competent evidence against the party making it; but the law is otherwise with regard to an independent fact admitted to be true, but not constituting such yielded point.' . . ." (Our emphasis.)

Plaintiff-appellant discusses the case of *Carpenter* v. *Goodall* (1969), 144 Ind. App. 134, 244 N. E. 2d 673 and distinguishes this case from that case, but has this remark to make:

"However, such is not the case at bar. The Appellant has affirmatively brought forth independent witnesses, five in number, who have discredited, and in the opinion of the Appellant, completely impeached his testimony and his general denial."

While it is true these witnesses were brought in and did testify, it is the law in Indiana that the trial court, as hereinabove stated, hears the evidence, observes their demeanor while on the witness stand, considers their bias and prejudice, their interest, if any, their knowledge or lack of knowledge, and it is solely within the province of the trial judge to determine these things and from them weigh the evidence.

Judge Thompson has been a very fine trial judge for many years. He observed the witnesses who testified and, no doubt, followed all the other rules that a trial judge is to follow in determining their credibility. It was Judge Thompson, the trier of the facts, who passed on this question and his doing so makes it impossible for this court to review and weigh the evidence and submit our judgment for that of the trial judge.

This law is so elementary that it actually needs no citation of authority; however, we will point out in the case of *Pontious* v. *Littleton* (1970), 146 Ind. App. 369, 255 N. E. 2d 684, 691 where the court said:

> "This court cannot, and will not, weigh the evidence; that was the duty of the trial court, who saw and observed the witnesses on the stand, took into consideration their truthfulness, their bias and interests in the case, and was in a better position to understand the evidence, draw inferences therefrom, and determine the truth of the collision in question."

The court further said, in quoting from *Armstrong* v. *Oster* (1919), 189 Ind. 1, 123 N. E. 109:

> " '* * * Where the evidence is conflicting, in determining whether a finding in favor of appellee is warranted, only the uncontroverted facts and the evidence most favorable to appellee and the favorable inferences that may be drawn therefrom can be considered on appeal. [Citing cases.]' "

Under the, guidelines of *Pontious* v. *Littleton, supra,* and *Armstrong* v. *Oster, supra,* it is our opinion and, it is necessarily so, that this court must find there was sufficient evidence that the trial court could find for the appellee and against the appellant and such finding and judgment was based on sufficient evidence.

We are of the further opinion that reasonable men, after hearing the evidence and drawing reasonable and natural inferences and carefully weighing the evidence might reason-

ably be expected to come to different conclusions. Reasonable men, in our opinion, after considering all the evidence in this cause, would not all come to but one and the same conclusion and, therefore, such finding and judgment of the trial court would not be contrary to law. *Pokraka* v. *Lummus Co., supra.*

Finding no reversible error, the judgment of the trial court is hereby in all things affirmed.

Lybrook and Robertson, JJ., concur.

NOTE.—Reported in 278 N. E. 2d 332.