## FRANCES WAUGAMAN, ADMINISTRATRIX *v.* GARY METHODIST HOSPITAL.

[No. 870A141. Filed March 2, 1972.]

*Saul I. Ruman,* of Hammond, *Orville W. Nichols, Nichols & Nichols,* of Knox, for appellant.

*T. H. Clifford, Lucas, Clifford & Wildermuth,* of Merrillville, *Paul E. Reed, Reed & St. Martin,* of Knox, for appellee.

SULLIVAN, J.—The action below was for wrongful death brought by Frances Waugaman, as Administratrix of the

Estate of her deceased husband, Ralph Waugaman, against Defendant appellee, Methodist Hospital of Gary, Indiana, and defendant Everett Johnson, the hospital Administrator. The case was tried by jury commencing on January 5, 1970.

After appellant presented her evidence, Johnson and Methodist Hospital moved for a judgment on the evidence. This motion was sustained as to Johnson, and sustained as to Methodist Hospital on appellant's theory of breach of warranty. The issues remaining between plaintiff and the hospital were litigated and the case was submitted to the jury which found for the hospital. Judgment was then entered upon the verdict.

The facts relevant to this appeal are as follows:

On September 4, 1966, decedent suffered an acute coronary occlusion of the muscles of his heart. Ironically at the time of the heart attack, decedent had been waiting for his daughter in the emergency room of appellee-hospital while she was being treated for a cut foot. In accordance with general medical practice, oxygen was administered immediately to Mr. Waugaman by order of one Dr. Klaus. This written order was not to be countermanded except by verbal direction of a doctor. During the period decedent remained on the ground floor of the hospital (approximately one hour and a half), oxygen was administered continually.

Subsequently, decedent was placed upon a cart in order to move him to a room on the fourth floor. While decedent was on the movable cart, no attempt was made to administer oxygen to him. Ostensibly, the general procedure for moving patients who are being given oxygen is to continue the treatment by means of portable tanks.

The hospital records indicate that oxygen was administered to decedent by a nasal catheter while he was on the fourth floor; however, that record is silent as to the time treatment began . A deposition of Dora Burgess Harding, a nurse working on the fourth floor when decedent was transferred there,

testified that oxygen was given to decedent within three to five minutes after his arrival on that floor. This deposition was admitted into evidence pursuant to T. R. 32(A)(2). Appellant testified to the contrary that when she arrived in her husband's room, he was not receiving oxygen. On direct examination, she testified as follows:

"Q. * * * we'll go back to the day of the incident we've been talking about. While you were on the fourth floor, did you ever see oxygen brought in and given to him?

A. No, it wasn't.

Q. At least while you were watching?

A. There was never none brought in.

Q. After you left the room, were there times maybe that your attention was on other things?

A. No, absolutely not.

Q. I thought you're in another waiting room?

A. I was in the hall, but I went back in there after he was dead. There was no tube even in the wall. He had never been given any oxygen.

Q. At least it could have been removed by that time, if he was dead; in other words, you weren't there while the people were in the room?

A. No, I wasn't.

Q. So you don't know what took place during that period in the room, really, do you?

A. No, I don't know what they did inside the room, but I know no oxygen was hooked up because there was no hose hooked to the wall even.

Q. You mean after you came in, after the death?

A. Yes, there was no hose coming from the wall."

Decedent died approximately one half hour after he had been moved to the fourth floor. The hospital record shows that at the time of death, decedent displayed a bluish skin color symptomatic of cyanosis, i.e., an insufficiency of the oxygen supply to the heart.

During the hospital's case in chief, Dr. John T. Scully, a heart specialist who treated decedent, testified that removal of oxygen for a period of thirty to thirty-five minutes would not have a significant effect upon decedent's acute coronary condition. He testified further that "the effects or efficiency of the value of oxygen in the ordinary person . . . is not remarkably valuable."

Plaintiff later called as a rebuttal witness Dr. Earl R. Leinbach, a general medical practitioner, who had no personal knowledge of the particular case. He was asked what his opinion would be as to the effect of the removal of oxygen for a period of thirty minutes, which question was objected to and sustained by the court. Appellant then offered to prove that if allowed to answer, Dr. Leinbach would testify that the removal of oxygen for a period of thirty minutes would be a serious threat to life. The offer was refused by the court.

We are here asked to decide two questions—First, whether the trial court committed prejudicial error in refusing to allow a doctor, who had testified in chief and was later called as a rebuttal witness, to testify as to the effect of removal of oxygen for periods of five minutes and thirty minutes from one who had just suffered a heart attack. Secondly, we are asked to determine whether the court erred in giving an instruction which expressly precluded the jury from basing their decision "upon mere guess, conjecture, surmise, possibility or speculation."

## COURT DID NOT ERR BY REFUSAL TO ADMIT REBUTTAL TESTIMONY OF APPELLANT

Plaintiff-appellant argues that the trial court abused its discretion in disallowing Dr. Leinbach to testify in rebuttal to Dr. Scully, the heart specialist who testified as appellee's expert witness. The pertinent parts of Dr. Scully's testimony are as follows:

"Q. Doctor, having in mind this particular patient and your examination of him, and assume that for a period of time, say three to five minutes, oxygen was removed from that patient's treatment, for example, moving him from the emergency room to the upstairs room, would that have any effect on this heart attack that you described?

A. A period of a few minutes actually would not have a significant effect upon an acute coronary as such. We wish that the benefits of oxygen were greater so that the benefit of oxygen would be more helpful because of the unhappy outlook in this particular disease but unfortunately, the administration of oxygen or oxygen not being given to a patient for a few minutes does not have that grave an effect on an individual with this particular problem.

Q. Now, assuming that this period of time was thirty, thirty five minutes, would that change your answer?

A. The primary reasons for the utilization of oxygen in an acute coronary with what is known as a myocardial infarction, the primary reason of such treatment of the myocardial infarction if the individual has gone into what is known as air failure where the lungs fill up very rapidly, these are the primary indications for it. Unfortunately, the effects or efficiency of the value of oxygen in the ordinary person with a coronary is not remarkably valuable. It is wished that it were, but it is not remarkably valuable and the situation is that it is not as vital as for a short period, it is more vital for the complications thereof of a heart attack."

It is appellee's contention that appellant's proffered evidence on rebuttal was covered by other evidence duly admitted during appellant's case in chief. As a general rule, a party should present all his evidence during his case in chief and not save a part of it to present for the first time on rebuttal. *Baum* v. *Palmer* (1905), 165 Ind. 513, 76 N. E. 108. Variation in the order of proof, however, is largely within the discretion of the trial court, *Carter* v. *Aetna Life Ins. Co.* (1940), 217 Ind. 282, 27 N. E. 2d 75; *Smith* v. *Metz* (1958), 129 Ind. App. 64, 153 N. E. 2d 919,

and a trial court which admits evidence out of its proper order will not be reversed unless it appears there has been an abuse of discretion which tends to defeat the ends of justice. *Deming Hotel Company* v. *Prox* (1968), 142 Ind. App. 603, 236 N. E. 2d 613; *Indianapolis Transit, Inc.* v. *Moorman* (1962) 134 Ind. App. 572, 189 N. E. 2d 111. The antithesis of this, however, does not necessarily follow. In other words, a trial court need not be reversed for its failure to allow a party to introduce part of his evidence on rebuttal which properly should have been made during his case in chief. Thus, when evidence offered on rebuttal does no more than reiterate and/or embellish what has been duly admitted during that party's case in chief, the one proferring the evidence on rebuttal cannot be harmed by the court's refusal to admit the evidence for the second time. *Maryland Casualty Co.* v. *Weiss* (1959), 129 Ind. App. 481, 156 N. E. 2d 644; *Costa* v. *Costa* (1953), 124 Ind. App. 128, 115 N. E. 2d 516.[1] In order to resolve appellant's charge that the trial court abused its discretion, we must first determine whether the refused evidence was cumulative in nature or whether it was truly rebuttal evidence. If we characterize it as cumulative, we must necessarily affirm the trial court's refusal to admit it. On the other hand, if we characterize it as true rebuttal evidence, we could reverse on this point only if appellant's offer to prove sufficiently called the court's attention to the intended purpose of the question and in what manner the evidence excluded would differ from the previously admitted evidence upon the same fact.

To decide these questions, we must peruse the pertinent testimony in the trial record. Beginning with plaintiff-appel-

---

1. Although the courts in the *Maryland Casualty* and *Costa* cases refused to admit cumulative evidence during the profferor's case in chief (as opposed to refusing it on rebuttal), the cases are clearly persuasive authority for the general proposition that exclusion of testimony is not an abuse of discretion where the proffered evidence already has been admitted.

lant's case in chief, Dr. Leinbach testified as follows on direct examination:

"Q. What effect does the complete lack of oxygen have in terms of the heart's life or living?

A. The complete lack of oxygen regardless of what source it is from, the complete lack of oxygen, since your heart is a very specialized type of muscle, its requirements for oxygen are quite high and therefore, the lack of oxygen would cause the heart to cease functioning.

Q. Then what effect would the administration of oxygen have in terms of the possibility of survival?

A. Well, the administration of oxygen is probably the one most important thing to try to give the heart the necessary raw material to keep on functioning.

Q. And what effect, if any, would that have with regards to either increasing or decreasing the possibility of survival?

A. Well, I think you would have to say it would increase the possibility of survival."

Later in plaintiff-appellant's case in chief, Dr. John R. Mathews, a general medical practitioner and non-attending physician, testified:

"Q. Now, what effect does oxygen have on life when administered to that, under those circumstances, to a heart attack patient?

A. To a heart attack patient, it's apt to prolong life; it may or may not. It may prolong it and it may not, depending on the severity of the heart attack.

Q. And how would breathing hard relate to the lack of oxygen assuming a patient where no oxygen is being administered and he begins breathing hard and turns blue in color, what significance by the lack of oxygen, would there be?

A. You mean what, would it help if he had had oxygen?

Q. Yes.

A. Yes, that would aid this lack of oxygen and would certainly help that patient get over his cyanosis, hopefully.

Q. Would it be possible, in addition to the effect that you've just talked about, in aiding the condition, is there any possibility in the administering of oxygen by max [sic] to keep that cyanosis from developing?

A. Yes, there is. It should prevent it unless the heart damage is too severe or too great.

Q. Then would the increased oxygen have any effect of keeping life for sometime?

A. Yes."

During rebuttal, the following questions here at issue were posed to Dr. Leinbach and to which appellee objected:

"Q. What would your opinion be, Doctor, as to the effect of the removal of oxygen for a period of five minutes?

MR. REED: To which we object, if the Court please, this is part of his case in chief and he testified concerning this in his case in chief. As a doctor, he should—

THE COURT: I'm going to sustain.

MR. RUMAN: I would like to make an offer to prove.

THE COURT: Yes.

MR. RUMAN: We offer in response to that question that the withdrawal of oxygen or oxygen mask for a period of five minutes would substantially endanger the life of the patient because of lack of oxygen.

THE COURT: Show the offer refused.

Q. Doctor, what, in your opinion, what would be the effect of removing oxygen from a heart attack patient for a period of thirty minutes?

MR. REED: To which we object, if the Court please, this is part of their case in chief and he testified concerning the effects of oxygen removed on the case in chief.

THE COURT: Sustained.

MR. NICHOLS: The plaintiff offers to prove in response to that question that in the doctor's opinion, the effect on a heart attack patient of removal of a mask when ordered for a period of time, would be a serious threat of life because of oxygen deficiency and the deficiency could produce death.

THE COURT: Show the offer refused and that the offer contains facts not within the question."

As heretofore noted, the effect of the administration and removal of oxygen was mentioned for the first time during plaintiff-appellant's case in chief, not during the case in chief of the appellee.[2] We do not know in fact what Dr. Leinbach's answers would have been on rebuttal if he had been permitted to answer the questions framed in terms of five and thirty minute time intervals. Nevertheless, we are restricted in our consideration to that which counsel for appellant has indicated in the offers to prove. Based upon more than the essence of what had been stated previously— that a heart patient requires oxygen, and that the lack thereof might cause the heart to cease functioning. The evidence, therefore, would be cumulative in effect. Furthermore, although the language differs slightly in each offer, the clear and logical import of each is precisely the same. The mere insertion of a time factor of five or thirty minutes into the question does not render the evidence sought to be elicited non-cumulative. The earlier testimony upon direct examination was all inclusive, i.e., that the absence of oxygen (without qualification as to duration) would jeopardize the possibility of survival. Thus, the time element was not shown by the offer to add any dimension or color to the earlier testimony. We must, therefore, conclude that Dr. Leinbach would have given the same answer regardless of the time period which might have been embraced in the particular question, and therefore that such answer would have been merely cumulative in its effect. It was, therefore, not reversible error for the trial court to refuse to permit such evidence upon rebuttal.

---

See *The Hammond, Whiting, etc., Ry. Co.* v. *Spyzchalski* (1896), 17 Ind. App. 7, 46 N. E. 47, which held that it was proper to allow a doctor to rebut testimony given for the first time in adversary's case in chief, even though this rebuttal witness testified in chief as to other matters.

## NO ERROR PRESERVED WITH REFERENCE TO COURT INSTRUCTION NO. 13

Appellant next contends that the trial court's final Instruction No. 13 was misleading and deprived appellant of a fair trial. The instruction reads as follows:

"The Court instructs you that your decision or finding must be based upon the proven facts and cannot be based on mere guess, conjecture, surmise, possibility or speculation."

Appellant's objection to the Instruction was as follows:

"Plaintiff would object to Court's 13 being Defendant's 2 on the basis that the Court has instructed the Jury in Court's Instruction 5 as to the burden of proof and 6 as to the meaning of preponderance of the evidence and that defendant's Instruction 2 is neither an instruction on preponderance or burden of proof, but is the test applied by the Trial Court in granting the directed verdict and approved by, on appeal, by the Court in *Halkias versus Gary National Bank,* and not laid down as an instruction of law for a jury, but rather as a test for the trial and Appellate Court; that the statement would be an incorrect statement of law as applied to the jury's function which requires surmise or inference from evidence, possibilities or speculations as to values in indeterminate value situations where they must value services as in a death case and that the contemplated law was only that they may not speculate or guess as to each, but based upon as a way in reaching their decision, they certainly are entitled to surmise, consider possibilities and speculate as to values of such matters as services to a family; the objection being it is an incorrect statement of law and in the cases cited and was not laid down as an instruction to be given to a jury. T.R. 226-7."

Appellant argues that the source of the instruction, *Halkias* v. *Gary National Bank* (1968), 142 Ind. App. 329, 234 N. E. 2d 652, is inapplicable based on the fact that in *Halkias,* the standard "mere guess, conjecture, surmise, possibility or speculation" was not applied to a jury instruction. Instead, it was a standard applied by the reviewing

court to determine whether or not a party had produced enough evidence to prevent a directed verdict. Although appellant's interpretation of *Halkias* is correct, we feel that the distinction she makes between that case and the instant cause is of no legal significance. The *Halkias* opinion properly states the law, and the purpose of instructing jurors is to inform them of the law applicable to the facts of the case. *Lindley* v. *Sink* (1940), 218 Ind. 1, 30 N. E. 2d 456. *Coleman* v. *Chapman* (1966), 139 Ind. App. 385, 220 N. E. 2d 285.

The Court in *Halkias* stated that to allow the jury to decide the issue of liability would require the jury to speculate and make conjecture as to the ultimate issue of liability. Because a finding or decision must be based on proven facts or upon reasonable inferences drawn therefrom as compared to guess, surmise or the like, the directed verdict there was upheld.

Notwithstanding prior pronouncements of this court such as in *Halkias, supra,* or *Kelly* v. *Davidson* (1958), 129 Ind. App. 384, 154 N. E. 288,[1] the phrasing of the particular instruction here in question is not encouraged. It does not acknowledge that the jury is entitled under law to draw reasonable inferences from proven facts in cases where the evidentiary facts do not of themselves, and without the drawing of a reasonable inference, dictate a conclusion that the ultimate fact is established. Although the Indiana Supreme Court in *Harper* v. *James* (1965), 246 Ind. 131, 203 N. E. 2d 531 approved an instruction analogous to the one in issue insofar as it advised the jury that they could not conjecture in reading their verdict, the instruction in *Harper* did not inject the words "proven facts" or any similar undefined terminology. Rather the *Harper* instruction was phrased to

---

1. This court in *Kelly* said:

"Our court has many times held that it is well settled that a decision or finding must be based upon the proven facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation. *Smith, Executrix* v. *Strock, Executor* (1945), 115 Ind. App. 518, 60 N. E. 2d 157, and cases cited. 129 Ind. App. 384, 392."

incorporate terminology presumably embraced in other stock instructions given, such as "preponderance of all the evidence" and "proximate cause." Thus, in *Harper* the jury had a framework of defined terms within which to gauge its fact finding duty.

In the case before us, however, the words "proven facts" are no where else defined. In no other instruction nor in the instruction in question is the jury advised that "proven facts" are those facts which the jury deems established by the preponderance of the evidence after having completed the entire fact finding process. Nor was the jury told in connection with the "proven facts" instruction that the process of determining what facts are proven is a distillation of many things including the assessment of circumstantial as well as direct evidence, the drawing of reasonable inferences where proper and necessary, the weighing of conflicting evidence and assessing the credibility of the witnesses. Had the instruction in question embraced these concepts, it would have been permissible much as the instruction in *Harper* was held to be correct.

We acknowledge that to advise a jury by instruction that proven facts alone may constitute the basis of a civil jury verdict may confuse and obfuscate the jury's understanding of their duty to determine the cause by a preponderance of the evidence. Ultimate facts are rarely established to a moral certainty and most verdicts necessarily hinge upon reasonable inferences drawn from evidentiary facts deemed by the jury to have been established by a preponderance of the evidence. See *Anderson* v. *J. C. Penney Company* (1971), 149 Ind. App. 325, 272 N. E. 2d 621.

The deficiency in court's Instruction No. 13, however, is not cause for reversal. Appellant's objection to the instruction in question does not point out to the trial court the particular omission as hereinabove treated. Rather, the objection is grounded upon a different premise, i.e., that "the jury's function * * * *requires* surmise or inference

from evidence, possibilities or speculations * * *." (Emphasis supplied). Appellant's statement of objection incorrectly states the law. *Harper* v. *James, supra.* As stated in Judge White's dissent in *Qualls* v. *J. C. Penney Co.* (1969), 144 Ind. App. 276, 285, 245 N. E. 2d 860, 865:

> "It has often been suggested by learned critics that courts at the appellate level often construe too narrowly the requirement that error be preserved by timely and adequate objection. Such criticism is actually a criticism of the adversary and advocate system and often underestimates the pressures and time limitations under which trial judges must operate. The assistance of trial counsel is essential to the orderly and efficient administration of justice in our system of justice."

In essence, our criticism of the particular instruction in issue is not so much that the words "proven facts" are objectionable in and of themselves, but rather that such words used alone might well connote to a jury something other than what the words mean in a technical, legal sense. The objection made by appellant below was therefore not sufficient to preserve the error in the giving of the instruction. *Conley* v. *Lothamer* (1971), 150 Ind. App. 356, 276 N. E. 2d 602.

Since appellant did not adequately apprise the trial court of the defect in Instruction No. 13, we will not reverse upon that asserted error.

Judgment affirmed.

White, P.J. and Buchanan, J., concur.

NOTE.—Reported in 279 N. E. 2d 240.